# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0207V
UNPUBLISHED

| | |
|---|---|
| DOMINIC SETARO,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: March 16, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barré Syndrome<br>(GBS) |

*Anne Carrion Toale*, Maglio Christopher & Toale, PA, Sarasota, FL, for Petitioner.

*Jennifer Leigh Reynaud*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On February 5, 2019, Dominic Setaro filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered Guillain Barré syndrome (GBS) resulting from the administration of an influenza ("flu") vaccine on October 3, 2016. Petition at 1, 5. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

Respondent conceded entitlement, but the parties differed on the quantum of damages to be awarded, and the disputed issues were heard at the February 2021 SPU Motions Day. For the reasons set forth below, **I find that Petitioner is entitled to an**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**award of damages in the amount of $160,000.00 in actual pain and suffering, and $500.00 per year, discounted to net present value, in future pain and suffering.**

### I.     Relevant Procedural History

This case was initiated in 2019. Respondent filed a Rule 4 Report conceding entitlement on March 24, 2020. ECF 30. On March 30, 2020, a Ruling on Entitlement was issued. ECF 31. After attempting to informally resolve the issue of damages for several months, the parties informed me in July 2020 that they could not do so. ECF 37. Accordingly, and after giving the parties an opportunity to file written briefs, I scheduled this matter for an expedited hearing and ruling. ECF 50. The hearing was held on February 26, 2021, and the only disputed damages component was pain and suffering.[3] Petitioner requests that I award him $200,000.00 for past pain and suffering, plus $2,000.00 per year for future pain and suffering. ECF 41 and ECF 46. Respondent proposes that I award the lesser amount of $110,730.00 for actual pain and suffering. ECF 44.

### II.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and

---

[3] An official recording of the proceeding was taken by court reporter. A link to instructions on the court's website detailing how to order a certified transcript or audio recording of the proceeding can be found in the Minute Entry dated February 26, 2021. *See also* www.uscfc.uscourts.gov/trans (last visited March 4, 2021).

suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Prior pain and suffering awards in comparable cases also bear on the findings reached herein. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III. Appropriate Compensation in this Case

In this case, awareness of the injury is not disputed. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents and at the expedited hearing held on February 26, 2021. I also considered prior awards for pain and suffering in both SPU and non-SPU GBS cases, and rely upon my experience in adjudicating those cases. However, I ultimately base my determination on the circumstances of this case.

Here, the record shows that Petitioner, a retiree, presented to the emergency room with complaints of a four-day history of weakness, tingling, and numbness in his extremities approximately two weeks after receiving the flu vaccine on October 3, 2016. Ex 1 at 1-2; Ex 4 at 562, 751-56. He was admitted to the hospital on October 20, 2016 (a little more than two weeks later), but his physicians struggled to determine a diagnosis. Ex 4 at 562-65, 754. After a week in the hospital, Petitioner was areflexic and his

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

weakness had progressed to include dysarthria and dysphagia. *Id*. at 562-65. And after testing for and ruling out many other conditions, a neurologist ordered IVIG treatment based on Petitioner's overall clinical picture and worsening condition. *Id*. at 567-68 and 985-86. Petitioner began IVIG treatment on October 29, 2016 and began improving after his first dose. *Id*. at 569. Petitioner was subsequently transferred to an inpatient rehabilitation facility on November 1, 2016. Ex 10 at 1. After nine days, Petitioner was discharged, at which time he reported that he was [f]eeling terrific." *Id*. at 25. His treatment notes reflect that Petitioner's strength had "returned very well" and his sensory deficits had improved. *Id*.

The day after his discharge from inpatient rehabilitation, Petitioner underwent an initial evaluation for physical therapy (PT). Ex 10 at 53-56. He reported difficulties with prolonged standing, housework, walking, and playing golf. *Id*. Physical examination (PE) revealed normal gait, but Petitioner did display weakness in his lower extremities. *Id*. He completed formal PT within two months and was advised to continue a home exercise program. Ex 7 at 5. Over the next year, Petitioner experienced gradual improvement; however, as of January 2018 he continued to complain of fatigue, pain, generalized numbness and tingling in his hands and feet. Ex 5 at 20. PE by his neurologist at that time showed minimal general weakness in the extremities, mild to moderate unsteady gait, hyporeflexia, and decreased vibration sense in the feet and hands. *Id*. at 21.

Petitioner continued with regularly treat his primary care physician and a neurologist over the next two years. At his most recent visit with his current neurologist (Dr. Michael Garbee) in August 2020, Petitioner complained of generalized pain and weakness, fatigue, and numbness and tingling in his extremities. Ex 38 at 3-4. PE at that time revealed normal muscle strength but absent and diminished reflexes, decreased facial sensation, and unsteady gait.[5] *Id*. In affidavits, both Petitioner and his daughter echo these findings, reporting that he has not returned to his prior level of functioning. Exs 34, 35.

As I informed the parties during the expedited hearing, the question in this case is not whether Mr. Setaro is entitled to *any* compensation for his pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case. This determination is not an exact science but more of an art. While it is tempting to "split the

---

[5] In the intervening years, Petitioner has also treated for several other conditions. For example, in June 2017, Petitioner also developed pain in his bilateral thumbs, which was diagnosed as degenerative joint disease (DJD). Ex 13 at 159. Petitioner also alleges that he has developed bruising and non-healing wounds, which he attributes to his GBS-related issues with balance. *See, e.g.*, Exs. 4, 14, 24. However, the record demonstrates that Petitioner had a history of non-healing wounds prior to his GBS diagnosis. Ex 4 at 1262, 1441, 1635. He was also diagnosed with rheumatoid arthritis (RA). Ex 13 at 2, 5. However, Petitioner disputes this diagnosis, noting that when he sought a second opinion, the examining rheumatologist opined that Petitioner "had no clinical findings of inflammatory arthritis." Ex 32 at 4.

difference" and award an amount halfway between the amounts proposed by the parties (based upon the determination that the parties' respective positions reasonably "frame" high and low potential awards), each petitioner deserves an examination of the specific facts in his or her case. Thus, while amounts ultimately awarded may end up falling somewhere in the range between the awards proposed by both parties, this result flows from a specific analysis of Mr. Setaro's personal circumstances.

In his brief, Petitioner references five prior GBS damages decisions[6] to support his proposed award of $200,000.00 in past pain and suffering plus $2,000.00 per year in future pain and suffering. The petitioners in all five of these cases were awarded approximately $180,000.00 in actual pain and suffering, but Mr. Setaro argues that he experienced a higher level of emotional distress than the petitioners in these five cases, which justifies an increased award.[7] Petitioner also argues that an August 2020 letter from Dr. Garbee, which lists Petitioner's reported symptoms and relates them all to Petitioner's history of GBS, should be given significant weight in determining his level of pain and suffering. Ex 38.

Respondent counters that Petitioner should be awarded $110,730.00 in pain and suffering. In support of this amount, Respondent relies on the records establishing that Petitioner experienced significant improvement after his discharge from inpatient rehabilitation, such that he reported that he was able to play nine holes of golf without pain, stand for 30 minutes, and complete typical household-related activities of daily living as of January 2017. Respondent further argues that Petitioner's current pain should be attributed to his DJD and RA, and that "any current disability [Petitioner] may have is predominantly, if not entirely, related to his other comorbid conditions." ECF 44.

After reviewing the record in this case and considering the parties' arguments during the hearing, I conclude that Petitioner's condition, while serious, did not cause

---

[6] *Johnson v. Sec'y of Health & Human Servs.*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July, 20, 2018); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019); *Fedewa v. Sec'y of Health & Human Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020); *Presley v. Sec'y of Health & Human Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. March 23, 2020); and *Devlin v. Sec'y of Health & Human Servs.*, No. 19-191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. August 7, 2020).

[7] In support of this argument, Petitioner's counsel submitted numerous medical articles discussing the long-term prognosis for most GBS patients. *See* ECF 42 and 43. Petitioner argues that the articles demonstrate that even though physical examination findings may show objective improvement from a numerical perspective (as they did with Petitioner), such findings do not accurately reflect the fatigue, pain, and sensory disturbances that GBS sufferers (including Petitioner) continue to experience in the years following their diagnosis.

more pain and suffering than what is common in GBS cases.[8] Petitioner argues that his difficulty receiving an appropriate diagnosis caused increased distress. However, this is an unfortunate aspect of many GBS claims. For example, the petitioner in *Fedewa* sought medical treatment three times before being admitted to the hospital,[9] and in *Devlin*, the petitioner pursued treatment for over a month before being diagnosed.[10]

In addition, while Petitioner argues that his continued symptoms support an increased award, the petitioner in *Dillenbeck* also "did not feel like she had returned to a baseline level of health" even four years after vaccination. *Dillenbeck* 2019 WL 4072069, at *2. The petitioner in *Presley* also continued to have weakness and numbness for more than 3 ½ years. *Presley* 2020 WL 407 2069 at *7. Further, unlike some petitioners whose GBS ends their working careers,[11] Petitioner was retired and was able to return to his golf hobby. While he likely does have difficulty holding the club and cannot hit the ball as far as he used to, as alleged, as of June 2020 Petitioner reported that he continues to play golf 4-5 times per week. Ex 36 at 17.

Finally, while I have considered Dr. Garbee's letter attributing all of Petitioner's alleged symptoms to his GBS, it does not outweigh the other evidence in the record. Petitioner did not begin treating with Dr. Garbee until June 2019, almost three years after vaccination, and the medical records clearly show diagnoses of other conditions during this period. Dr. Garbee failed to even mention these conditions when describing Petitioner's functioning. Ex 38. Further reducing the persuasiveness of this letter is the fact that Dr. Garbee attributed Petitioner's complaints of vertigo to a "cranial nerve dysfunction" caused by his GBS. *Id*. However, Petitioner had never reported vertigo prior to June 2020, and Dr. Garbee provided no explanation as to how such a symptom would develop almost four years after vaccination, again suggesting that he may not have reviewed the record in its entirety. *Id*.

When balancing Petitioner's extensive initial treatment with his significant and relatively uncomplicated recovery, and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw, and the written record, I find that $160,000.00 in compensation for past pain and suffering is reasonable in this case. This sum exceeds in reasonable amount what Respondent proposed, but is properly less than what some of the other petitioners referenced herein received for comparably worse

---

[8] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through July 31, 2020 reveals a median award amount of $165,000.00. Awards have typically ranged from $125,000.00 to $270,000.00, representing cases between the first and third quartiles.

[9] *Fedewa* 2020 WL 1915138, at *2-3.

[10] *Devlin* 2020 WL 5512505, at *3.

[11] *See,* e.g., *Dillenbeck* 2019 WL 4072069, at *10-11.

circumstances.

As for future pain and suffering, there are few reasoned GBS damages decisions addressing this issue. The petitioner in *Dillenbeck* "did not feel like she had returned to a baseline level of health" even four years after vaccination and continued to take prescription medication for her symptoms. *Dillenbeck* 2019 WL 4072069, at *2. As noted above, the petitioner in *Dillenbeck* was unable to return to her prior job, while Petitioner was retired at the time of his GBS diagnosis. However, he too experiences residual symptoms and is prescribed medication for pain control. Therefore, I find that the facts of these two cases are similar enough to support awarding Petitioner $500.00 annually for future pain and suffering. That sum shall be reduced to net present value consistent with my calculation in *Dillenbeck*. 2019 WL 4072069, at *15 (one percent net discount rate for the first fifteen years of the award, followed by a two percent net discount rate for any remaining years).

## IV. Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, I find that $160,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering, and $500.00 per year, reduced to net present value, for the rest of his life expectancy, for Petitioner's future pain and suffering. Mr. Setaro's date of birth is July 9, 1948, and his remaining life expectancy is approximately 13.3 years.[12] Thus, his future pain and suffering damages total approximately $6,650.00, prior to conversion to net present value.

**The parties are to file a joint status report, by no later than <u>Tuesday, March 30, 2021</u>: (1) converting my award of future pain and suffering to its net present value,[13] and (2) reporting on all outstanding items of damages that remain unresolved, if there are any remaining issues. Once these issues have been resolved, a damages decision will issue.**

---

[12] The Social Security Administration (SSA) calculates life expectancy. Their life expectancy calculator can be found at https://www.ssa.gov/OACT/population/longevity.html (last visited March 4, 2021). According to SSA's life expectancy calculator, Mr. Setaro has an additional life expectancy of 13.3 years. He is expected to live to be 86.0 years old. *Id*.

[13] As noted above, the parties should reduce the sum to net present value consistent with my calculation in *Dillenbeck*. 2019 WL 4072069 at *15 (one percent net discount rate for the entirety of the award, based upon a predicted life expectancy of 13.3 years).

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
